## STATE OF CONNECTICUT *v.* MAXIME HILL (15011)

Peters, C. J., and Callahan, Berdon, Norcott and Palmer, Js.

Argued December 6, 1995—officially released May 21, 1996

*Jon L. Schoenhorn*, with whom, on the brief, was *Beth J. Rittenband*, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's

attorney, and *Maureen Keegan*, assistant state's attorney, for the appellee (state).

PALMER, J. A jury found the defendant, Maxime Hill, guilty of possession of more than one-half gram of crack cocaine with the intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (a) and possession of heroin with the intent to sell in violation of General Statutes § 21a-277 (a).[1] The defendant has appealed[2] from the judgment of the trial

---

[1] General Statutes § 21a-278 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person one or more preparations, compounds, mixtures or substances containing an aggregate weight of one ounce or more of heroin, methadone or cocaine or an aggregate weight of one-half gram or more of cocaine in a free-base form or a substance containing five milligrams or more of lysergic acid diethylamide, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, shall be imprisoned for a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

Cocaine in a free-base form is commonly known as "crack" cocaine.

General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

court sentencing him to an effective term of imprison-
ment of thirteen years.[3] On appeal, he claims that: (1)
the trial court improperly failed to suppress certain
narcotics seized by the police in violation of his consti-
tutional rights; (2) he was convicted and sentenced on
the two separate narcotics offenses in violation of the
constitutional prohibition against double jeopardy; and
(3) the evidence adduced at trial was insufficient to
establish that he intended to sell crack cocaine and
heroin. We affirm the judgment of the trial court.

A jury reasonably could have found the following
facts. On September 16, 1992, Sergeant Michael Ricci
of the Waterbury police department was patrolling the
north end of the city in a marked police cruiser. In
the late morning, Ricci, who was alone in the vehicle,
observed two men, the defendant and an unidentified
male, engaged in conversation on the sidewalk opposite
Ricci's cruiser, about 100 feet away, in front of 33 Irion
Street. The unidentified male, who was facing in Ricci's
direction, saw the cruiser approaching and hurriedly
walked away, disappearing from Ricci's view into an
adjacent alleyway. The defendant, who had been stand-
ing with his back to the cruiser, turned around and, upon
observing the police vehicle, walked quickly toward the
entrance to the first floor apartment at 33 Irion Street.
Ricci, now about fifty feet away from the defendant, saw
that he was holding a plastic "sandwich-type" baggie.

Ricci pulled his cruiser over to the opposite side of
the road and parked it, against the traffic, in front of
33 Irion Street. As Ricci was exiting his vehicle, he
observed the defendant enter the 33 Irion Street apart-
ment and toss the plastic baggie to his right, just inside
the doorway of the apartment. Ricci followed the

---

[3] The defendant was sentenced to concurrent prison terms of thirteen
years on the charge of possession of crack cocaine with the intent to sell
by a person who is not drug-dependent and ten years on the charge of
possession of heroin with the intent to sell.

defendant through the open doorway, observed the baggie on a couch located immediately to his right, and proceeded to the rear of the apartment, where he apprehended the defendant and detained him. Moments thereafter, a second police officer arrived at the apartment to assist Ricci, who then retrieved the baggie from the couch. A search of the baggie's contents revealed forty-four pink "zip-lock" bags, each containing a white, rock-like substance subsequently determined to be crack cocaine,[4] three small glassine packets, each containing a white powder subsequently determined to be heroin,[5] and several empty zip-lock bags. The defendant was then placed under arrest and transported to the police station. Additional facts will be set forth as they become relevant.

Prior to trial, the defendant moved to suppress the narcotics seized by the police at 33 Irion Street on the ground that the evidence had been obtained in violation of his rights under the federal and state constitutions. After an evidentiary hearing, the trial court denied the defendant's motion and the narcotics evidence was introduced by the state in its case-in-chief. At the conclusion of the trial, the jury found the defendant guilty as charged.

I

At the suppression hearing, the defendant claimed that he was illegally seized by Ricci while he was standing in front of 33 Irion Street because Ricci did not have a sufficient basis to detain him at that time as required under article first, §§ 7 and 9, of the Connecticut constitution.[6] The defendant further claimed that

---

[4] The cocaine seized from the 33 Irion Street apartment was 99.7 percent pure cocaine and weighed a total of 6.5 grams.

[5] The total weight of the heroin seized from the 33 Irion Street apartment was less than one tenth of one ounce.

[6] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unrea-

Ricci's warrantless entry into the 33 Irion Street apartment violated his rights under the fourth amendment to the United States constitution[7] and under article first, §§ 7 and 9, of the Connecticut constitution.[8] The defendant maintained that each of these allegedly illegal actions provided a separate and independent basis for the suppression of the narcotics evidence confiscated by the police from the 33 Irion Street apartment. The trial court disagreed, concluding, as to the first claim, that the defendant had not been seized by the police until he was detained by Ricci inside the apartment and, as to the second claim, that the defendant did not have standing to challenge the warrantless police entry into the apartment. On appeal, the defendant contends that the trial court's conclusions are not supported by the evidence and, accordingly, that the court's denial of his motion to suppress was improper. We disagree with the defendant.

## A

The defendant first claims that the trial court improperly concluded that he was not seized within the mean-

sonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[7] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[8] It is not entirely clear from the record of the proceedings in the trial court whether this claim was raised by the defendant. On appeal, however, the state does not contend either that the defendant failed to raise the claim below or that the record is inadequate for our review of the claim. Accordingly, we treat the defendant's claim as having been raised in the trial court.

ing of article first, §§ 7 and 9, of the state constitution when Ricci approached him in the police cruiser while he was standing on the sidewalk in front of 33 Irion Street.[9] The defendant further maintains that all evidence obtained by the police subsequent thereto must be suppressed as the fruit of the illegal detention. We are not persuaded that the defendant was seized while he was on the sidewalk.

We have recently articulated the test for determining whether a person has been seized for purposes of the Connecticut constitution: "[A] person [is defined] as 'seized' under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining whether a seizure has occurred, so as to invoke the protections of our state constitution . . . a court is to consider whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. . . . Whether there has been such a seizure in an individual case is a question of fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Oquendo*, 223 Conn. 635, 647, 613 A.2d 1300 (1992).[10] Furthermore, "[t]he trial court's

---

[9] The evidentiary hearing on the defendant's motion to suppress was conducted after the jury had heard testimony from one state's witness, Thomas DiStasio, a draftsman in the Waterbury tax assessor's office, who testified concerning the location of 33 Irion Street. At the conclusion of DiStasio's testimony, the trial court excused the jury and commenced the hearing on the defendant's motion to suppress. Ricci was the lone state's witness at the suppression hearing. The defendant called no witnesses in support of his suppression motion, choosing instead to rely on his cross-examination of Ricci. At the conclusion of Ricci's testimony, the trial court denied the defendant's motion to suppress.

[10] In *Oquendo*, we refused to adopt, for purposes of the state constitution, the standard established by the United States Supreme Court to determine when a seizure has occurred under the fourth amendment. See *California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991) (seizure for purposes of fourth amendment requires either physical force or submission to assertion of authority). The state now asks us to reject the test enunciated in *Oquendo* in favor of the standard applicable under

determination [of whether a seizure occurred] will not be overturned unless it was clearly erroneous. . . . When a factual issue implicates a constitutional claim, however, we review the record carefully to ensure that its determination was supported by substantial evidence." (Citation omitted.) *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993).

After a thorough review of the record, we conclude that the trial court's determination that the defendant was not seized until after he had entered the apartment at 33 Irion Street is amply supported by the evidence.[11] As the trial court expressly found,[12] Ricci's actions out-

the federal constitution. Because we agree with the state that the defendant was not seized outside 33 Irion Street under the standard set forth in *Oquendo*, we need not reconsider whether our test should be modified.

[11] As previously indicated, the defendant did not call any witnesses at the suppression hearing. See footnote 9. We note, however, that the defendant's trial testimony is inconsistent with his claim that he was seized by the police outside 33 Irion Street. At trial, the defendant testified that he had arrived in Waterbury from his home in New York on the morning of September 16, 1992, and parked in front of 33 Irion Street. The defendant stated that he had not stopped outside 33 Irion Street to speak to anyone but, rather, had proceeded directly to the front door of the ground level apartment, where he was allowed entry by one of the apartment's occupants. The defendant further testified that Ricci and other police officers had arrived a few minutes thereafter. According to the defendant, he had not seen Ricci or any other police officer until that time. Thus, under the defendant's sworn version of the facts, he never observed Ricci or Ricci's cruiser prior to entering the apartment at 33 Irion Street. If the defendant's testimony is to be believed, it can hardly be argued that he was seized at any time prior to his detention by the police inside the apartment. In light of the fact, however, that the trial court's ruling on the defendant's suppression motion was based solely on the evidence adduced at the suppression hearing, and because the state does not contend that the defendant's suppression claim is foreclosed by his trial testimony; cf. *State* v. *Person*, 236 Conn. 342, 346–51, 673 A.2d 463 (1996); we limit our review of the defendant's claim to the evidence relied upon by the trial court in deciding the defendant's suppression motion.

[12] At the conclusion of the evidentiary hearing on the defendant's suppression motion, the trial court stated in relevant part: "Based on the evidence I have heard, based on the testimony of [Ricci], I have to agree with the state's position that there [was] no seizure involved outside of the building. There was absolutely no show of force. The only indication from [the] police officer's testimony with respect to what action he was taking [was that he

side 33 Irion Street were limited to pulling up to the curb on the wrong side of the street and exiting his vehicle.[13] Although Ricci was in uniform and operating a marked police vehicle, Ricci testified that he never turned on his emergency lights, headlights, loudspeaker or siren, that he did not order the defendant to stop or otherwise attempt to communicate with the defendant in any way, and that he did not display a weapon. Thus, the evidence established that Ricci did not confront the defendant or engage in any other conduct that reasonably could have caused the defendant to believe that he was required to remain on the sidewalk in front of 33 Irion Street as Ricci's cruiser approached.

The defendant nevertheless contends that he was seized outside 33 Irion Street when Ricci "drove toward him on the wrong side of the road at a rapid speed and then exited the vehicle." Even if such conduct by the police could constitute a show of authority sufficient to cause a reasonable person to believe that he or she was not free to leave, the trial court was not bound to agree with the defendant's characterization of Ricci's conduct. Although Ricci stated that only a few seconds

was] going toward the individuals involved. One initially walked off right from the beginning when he saw the officer. The defendant, or the individual [whom Ricci] identified as the defendant, simply walked into an apartment room. There was no indication by the defendant's conduct that he thought he should stop or that he was being stopped by [the] police. And, there was absolutely no testimony from [the] officer indicating any kind of conduct that would constitute a seizure under our law as it currently stands."

[13] At the suppression hearing, Ricci, who had previously been assigned to the police department's vice and intelligence division, testified that the area he had been patrolling when he encountered the defendant is often frequented by drug traffickers, and that he has personally conducted investigations at the 33 Irion Street residence, which he characterized as a known haven for drug users. Ricci further explained that he had become suspicious of the defendant when he saw the defendant holding a plastic "sandwich-type" baggie, commonly used by street-level drug dealers to store narcotics, after the unidentified male with whom the defendant had been conversing hurriedly left the area as Ricci's cruiser approached.

had elapsed from the moment he first saw the defendant until he exited his police vehicle,[14] he also testified that he traveled only about 100 feet in that brief period. Because Ricci's testimony is entirely consistent with the conclusion that he was traveling at a slow or moderate rate of speed,[15] the trial court was not required to conclude, contrary to the defendant's claim, that Ricci had proceeded on Irion Street toward the defendant at a high rate of speed.

Moreover, the defendant adduced no evidence to establish that he saw Ricci exit the police cruiser. In fact, Ricci's uncontradicted testimony suggests quite the opposite: according to Ricci, he observed the defendant enter the 33 Irion Street apartment and toss aside the plastic baggie before Ricci had opened the door to his cruiser. In the absence of proof that the defendant was aware that Ricci had exited his vehicle, the fact that Ricci did so provides no support for the defendant's claim that "a reasonable person in the defendant's position would have believed that he was not free to leave." *State* v. *Oquendo*, supra, 223 Conn. 653.

The only evidence that arguably supports the defendant's claim is Ricci's testimony that he drove down Irion Street in the direction of the defendant and parked on the wrong side of the street. We are unable to conclude, based solely upon those facts, that a person in the defendant's position reasonably would have concluded

[14] In response to the question of how much time had elapsed from when he saw the defendant until he exited his cruiser, Ricci testified as follows: "It was seconds. I couldn't estimate. I know it wasn't a minute or anything. It was seconds, where it would take me for a hundred feet or so." Later, Ricci testified that he did not know how fast he was driving as he approached the defendant in his cruiser.

[15] For example, a car traveling at twelve miles per hour would cover 100 feet in just under six seconds.

that he was required to remain on the sidewalk in front of 33 Irion Street. The mere approach by a police officer, either in a police car or on foot, does not alone constitute a show of authority sufficient to cause the subject of the officer's attention reasonably to believe that he or she is not free to leave. To conclude otherwise would be to render unconstitutional a broad range of police investigatory activity that has long been deemed proper. "Police officers do not violate an individual's constitutional rights by approaching him, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering into evidence in a criminal prosecution his voluntary answers to such questions. *Florida* v. *Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State* v. *Brown*, 199 Conn. 47, 52–53, 505 A.2d 1225 (1986)." *State* v. *Damon*, 214 Conn. 146, 153–54, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990). If questioning by the police on the street does not necessarily give rise to constitutional protections, we fail to see why the trial court was required to conclude that Ricci's actions, which included no attempt to communicate with the defendant, constituted a seizure for constitutional purposes. Because the trial court's conclusion that the defendant was not seized outside 33 Irion Street is fully supported by the evidence, the defendant's claim must fail.[16]

## B

The defendant next contends that the trial court improperly concluded that he lacked standing, under

[16] The defendant also claims, for the first time on appeal, that his identification should also be suppressed as the fruit of an illegal seizure within the apartment. The record, however, fails to disclose any indication of when the police identified the defendant. Thus, the record is insufficient to evaluate this unpreserved claim and, accordingly, we decline to review it under the first prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

either the federal or the state constitution, to challenge the propriety of Ricci's warrantless search of the 33 Irion Street apartment.[17] We disagree.

The touchstone to determining whether a person has standing to contest an allegedly illegal search is whether that person has a reasonable expectation of privacy in the invaded place. *Rakas* v. *Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *State* v. *Joyce*, 229 Conn. 10, 20, 639 A.2d 1007 (1994). " 'Absent such an expectation, the subsequent police action has no constitutional ramifications.' " *State* v. *Mooney*, 218 Conn. 85, 94, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); *State* v. *Brown*, 198 Conn. 348, 355, 503 A.2d 566 (1986). "In order to meet this rule of standing . . . a two-part subjective/objective test must be satisfied: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Joyce*, supra, 20.[18] Furthermore, "[t]he defendant bears the burden of establishing the facts

---

[17] " '[A]bsent consent to entry or exigent circumstances, a judicial determination of probable cause must stand in between the police and the door of a person's home, whether the object of an entry is to search and seize or to arrest.' " *State* v. *Geisler*, 222 Conn. 672, 682, 610 A.2d 1225 (1992). The state contends that Ricci's warrantless entry into the apartment at 33 Irion Street was justified by probable cause and exigent circumstances. We do not reach the state's argument in light of our conclusion that the defendant does not have standing to challenge the warrantless entry.

[18] In *Joyce*, we articulated the test for standing under article first, § 7, of the Connecticut constitution. The test is the same under the United States constitution. See *Minnesota* v. *Olson*, 495 U.S. 91, 95–96, 110 S. Ct. 1684,

necessary to demonstrate a basis for standing"; *State v. Callari*, 194 Conn. 18, 23, 478 A.2d 592 (1984), cert. denied, 469 U.S. 1210, 105 S. Ct. 1178, 84 L. Ed. 2d 327 (1985); and the trial court's "finding [on the question of standing] will not be overturned unless it is legally or logically inconsistent with the facts found or involves an erroneous rule of law." *State v. Pittman*, 209 Conn. 596, 601, 553 A.2d 155 (1989).

It is well established that the owner or tenant of a dwelling has standing to contest the legality of a search of that premises. *Rakas v. Illinois*, supra, 439 U.S. 142; *State v. Brown*, supra, 198 Conn. 357. However, "[t]he capacity to claim the protection of the fourth amendment does not depend upon a proprietary interest, permanency of residence, or payment of rent but upon whether the person who claims fourth amendment protection has a reasonable expectation of privacy in the invaded area. . . . Further, the fact that a person does not have the exclusive use of an area does not bar his having a reasonable expectation of privacy that furnishes standing to object to a government seizure." (Citations omitted.) *State v. Reddick*, 207 Conn. 323, 330–31, 541 A.2d 1209 (1988). Accordingly, a person who makes a telephone call from a public telephone booth may challenge the state's warrantless interception of the call; *Katz v. United States*, 389 U.S. 347, 352–53, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); and an overnight guest has the right to contest a warrantless entry into his or her host's home. *Minnesota v. Olson*, 495 U.S. 91, 98, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990); *State v. Brosnan*, 221 Conn. 788, 807–809, 608 A.2d 49 (1992); *State v. Reddick*, supra, 331. Thus, "a person may have a sufficient interest in a place other than

109 L. Ed. 2d 85 (1990) (person claiming protection of fourth amendment must have expectation of privacy in invaded place that society is prepared to recognize as reasonable).

his home to enable him to be free in that place from unreasonable searches and seizures"; *Minnesota* v. *Olson*, supra, 98; so long as the place is one "in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy."[19] *United States* v. *Taborda*, 635 F.2d 131, 138 (2d Cir. 1980); *State* v. *Mooney*, supra, 218 Conn. 95.

The defendant claims that he had a reasonable expectation of privacy in the apartment at 33 Irion Street and, therefore, that he has a right under both the federal and state constitutions to contest Ricci's warrantless search of those premises. Although he concedes that he was not an overnight guest, he contends that his subjective expectation of privacy was objectively reasonable because he had entered the apartment with the consent of the apartment's tenants and had temporarily left his backpack there.[20] We conclude that the trial court properly denied the defendant's suppression motion on the ground that he failed to sustain his burden of establishing standing under either the state or the federal constitution.

As we have previously indicated, Ricci was the only witness to testify at the suppression hearing conducted

[19] "Legitimate expectations of privacy derive from 'concepts of real or personal property law or [from] understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.' *Rakas* v. *Illinois*, supra, [439 U.S.] 144 n.12. Of course, one need not have an 'untrammeled power to admit and exclude' in order to claim the protection of the fourth amendment, so long as the place involved is one affording an expectation of privacy that society regards as reasonable." *State* v. *Mooney*, supra, 218 Conn. 95–96.

[20] It was revealed at trial that the defendant's backpack contained some clothing, deodorant and certain other unspecified personal belongings.

by the trial court. At no time during the suppression hearing testimony, however, did Ricci indicate either that the defendant had permission to be at the 33 Irion Street apartment or that the defendant's backpack was in the apartment. The defendant, moreover, offered no other evidence in support of his claim of standing. In light of the evidence before it, therefore, the trial court properly concluded that the defendant had adduced "no evidence with respect to standing. . . . There is no indication on the record of any standing of the defendant."

As the defendant points out, however, evidence was later presented at trial indicating that he had permission to be in the apartment at 33 Irion Street and that he had briefly unshouldered his backpack there. The defendant claims that this evidence is sufficient to establish his standing to contest the warrantless seizure of the narcotics inside the 33 Irion Street apartment.[21] We disagree.

The defendant testified that he knew the tenants of the 33 Irion Street apartment and that he had traveled there from his home in New York to pick up an acquaintance, Michael Hurdle, who was a tenant of the apartment. The defendant also testified that the police arrived at the apartment only moments after he had arrived there and shortly before he and Hurdle were about to depart.

Notwithstanding the defendant's unsupported assertion to the contrary, the defendant's fourth amendment standing claim is foreclosed by *Rakas* v. *Illinois*, supra, 439 U.S. 142, wherein the United States Supreme Court stated that "a casual visitor who walks into a house one minute before a search of the house commences

---

[21] On appeal, the state has not challenged the truthfulness of this testimony, nor has it argued that we should refrain from considering the additional evidence in reviewing the defendant's claim of standing.

and leaves one minute after the search ends . . . [has] *absolutely no interest or legitimate expectation of privacy in the [house]* . . . ." See also *State* v. *Brown*, supra, 198 Conn. 357–59 (person whose right of access to rented garage is shared with other tenants has no legitimate expectation of privacy in that space).

The defendant also argues that he is entitled to challenge the seizure of the narcotics under article first, § 7, of the state constitution. Specifically, he urges us to construe our state constitution as embracing a broader view of the "reasonable expectation of privacy" test, under which a houseguest would have the right to contest a search of his or her host's home. Because "our adoption of an analytical framework or methodology used under the federal constitution does not compel this court to reach the same outcome that a federal court might reach when the methodology is applied to a particular set of factual circumstances"; *State* v. *Joyce*, supra, 229 Conn. 18 n.12; we are required to determine whether the defendant's expectation of privacy in the 33 Irion Street apartment was an objectively reasonable one for state constitutional purposes. See, e.g., *State* v. *DeFusco*, 224 Conn. 627, 633, 620 A.2d 746 (1993) (whether article first, § 7, of state constitution affords greater protection than federal constitution against warrantless searches of garbage placed at curb for collection requires determination of whether defendant's expectation of privacy in such garbage is one that Connecticut citizens would deem reasonable). The defendant, however, has offered no explanation why his momentary stop at the 33 Irion Street apartment gave rise to an expectation of privacy in those premises that could be recognized as reasonable even under the most expansive application of the "reasonable expectation of privacy" test.[22] Accordingly, we conclude that the

---

[22] We need not decide, therefore, the extent to which the "reasonable expectation of privacy" test may be broader under article first, § 7, of our

defendant lacks standing to challenge the legality of Ricci's warrantless entry into the apartment under the state constitution.[23]

state constitution than it is under the fourth amendment to the federal constitution.

[23] The dissent's assertion that we have declined to address the defendant's state constitutional claim regarding standing is incorrect. As we have indicated, we conclude that the defendant has properly raised and briefed the question of whether he may be entitled to a broader interpretation of the "reasonable expectation of privacy" test under the state constitution than he is under the federal constitution. We also conclude, however, that the defendant's state constitutional claim, even construed most generously, cannot reasonably be interpreted as urging us to adopt the doctrine of automatic standing under the state constitution.

In his initial brief, the defendant's entire claim under the state constitution is that article first, § 7, affords a more expansive interpretation of the reasonable expectation of privacy standard than does the federal constitution. Indeed, his sole reference to automatic standing is the observation that "[t]o date, the court has not joined with some other state courts of last resort that hold that state constitutional or statutory provisions require continued adherence to the standing doctrine of *Jones* [v. *United States*, 363 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960)]," followed by citations to cases from four of those jurisdictions.

It is only in his reply brief that the defendant recharacterizes his claim as asserting that "the Connecticut constitution affords greater rights to its citizens to challenge seizures under the 'automatic standing' doctrine first enunciated in *Jones*." This doctrine, which confers standing on a defendant who is legitimately on the invaded premises or who has been charged with an offense of which possession of the seized item is an element, was adopted for fourth amendment purposes by the United States Supreme Court in *Jones* v. *United States*, supra, 363 U.S. 257, but was later rejected in favor of the "reasonable expectation of privacy" test. *United States* v. *Salvucci*, 448 U.S. 83, 92–93, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980). Although we previously followed *Jones* in applying the automatic standing rule to claims under the federal constitution; see *State* v. *McLucas*, 172 Conn. 542, 375 A.2d 1014, cert. denied, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977); we abandoned the test following the *Salvucci* decision. *State* v. *Altrui*, 188 Conn. 161, 179 n.6, 448 A.2d 837 (1982). As the defendant notes in passing, we have never had occasion to consider whether our state constitution embraces the doctrine of automatic standing set forth in *Jones*.

We decline the defendant's belated invitation to decide this question, which, as the defendant himself concedes, was never raised in the trial court. Although the defendant asserts in his reply brief that he did, in fact, raise the claim in his main brief, we agree with the state that the issue was not adequately raised or briefed. " 'It is a well established principle that arguments cannot be raised for the first time in a reply brief. . . .' " *Williams*

## II

The defendant next contends that his separate convictions and sentences for possession of more than one-half gram of crack cocaine with the intent to sell by a person who is not drug-dependent under § 21a-278 (a) and for possession of heroin with the intent to sell under § 21a-277 (a) violated the double jeopardy clause of the fifth amendment to the United States constitution.[24] Although the defendant failed to raise this claim in the trial court, he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[25] We agree

*Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 593–94 n.26, 657 A.2d 212 (1995). At no point in his main brief did the defendant clearly indicate that we should adopt a rule of automatic standing for purposes of the state constitution, nor did he engage in any of the substantive analysis that is a necessary prerequisite to our consideration of state constitutional claims. See, e.g., *State* v. *Perez*, 218 Conn. 714, 723–24, 591 A.2d 119 (1991). Thus, contrary to the dissent's assertion, the defendant's passing reference to the fact that this court has not heretofore considered the automatic standing question cannot suffice to satisfy even the most minimal standard concerning the raising and briefing of constitutional claims. Accordingly, although we agree that the question of whether our constitution embodies the concept of automatic standing is a significant one, we conclude that its importance dictates that we not address it until it is properly before us.

[24] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." The prohibition against double jeopardy is applicable to the states through the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

The defendant also claims a violation under the due process guarantee of article first, § 9, of the Connecticut constitution, which we have construed to prohibit double jeopardy. *State* v. *Chicano*, 216 Conn. 699, 706, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). Because the defendant has provided no independent analysis of his double jeopardy claim under the state constitution, however, we consider his claim under the federal constitution only.

[25] In *Golding*, we held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged

that the record is adequate for review of the defendant's double jeopardy claim, but we conclude that he is not entitled to relief.

The constitutional guarantee against double jeopardy "serves three separate functions: (1) It protects against a second prosecution for the same offense after acquittal. [2] It protects against a second prosecution for the same offense after conviction. [3] And it protects against multiple punishments for the same offense [in a single trial]. *North Carolina* v. *Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969)." (Internal quotation marks omitted.) *State* v. *Chicano*, 216 Conn. 699, 706, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). The defendant's claim implicates the last of these three protections. To prevail thereunder, the defendant must establish both that the charges arise out of the same act or transaction and that the charged crimes are the same offense.[26] *State* v. *Greco*, 216 Conn. 282, 290–91, 579 A.2d 84 (1990).

In determining whether the crimes charged constitute the same offense, we must ascertain the intent of the legislature. "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri* v. *Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983); *Garrett* v. *United States*, 471 U.S. 773, 793, 105 S. Ct. 2407, 85 L. Ed. 2d 764 (1985); *State* v. *Greco*, supra, 216 Conn. 290. "[T]he role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multi-

constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[26] It is not disputed that the charges, which arise from the defendant's simultaneous possession of the two different types of narcotics, stem from the same act.

ple punishments for the same offense." *Brown* v. *Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977); *State* v. *Greco*, supra, 290; see also *Albernaz* v. *United States*, 450 U.S. 333, 344, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981) ("the question of what punishments are constitutionally permissible is not different from the question of what punishment the Legislative Branch intended to be imposed"). "The issue, [therefore,] though essentially constitutional, becomes one of statutory construction." *State* v. *Rawls*, 198 Conn. 111, 120, 502 A.2d 374 (1985).

"The traditional approach to analyzing whether two offenses constitute the same offense [for double jeopardy purposes] was set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Greco*, supra, 216 Conn. 291.

Application of the *Blockburger* test to this case leads to the conclusion that the information alleges two separate and distinct offenses for double jeopardy purposes. The first count of the information charges the defendant with possessing *more than one-half gram of cocaine in a free-base form* with the intent to sell, while the second count alleges that the defendant possessed *heroin* with the intent to sell. Because each of the two charges requires proof of a fact that the other does not, it may be presumed that the legislature did not intend to prohibit multiple punishments for the conduct underlying the two charges.

Because the *Blockburger* test creates only a rebutta-ble presumption of legislative intent, the test is not controlling when a contrary intent is manifest. *State* v. *Kulmac*, 230 Conn. 43, 70, 644 A.2d 887 (1994); *State* v. *Greco*, supra, 216 Conn. 292. It is clear, however, that the pertinent statutory language, when viewed in the context of the purpose of our drug laws, fully supports the conclusion that the possession of one-half gram or more of crack cocaine with the intent to sell by a person who is not drug-dependent under § 21a-278 (a) and pos-session of heroin with the intent to sell under § 21a-277 (a) give rise to separate crimes carrying separate punishments.

First, although crack cocaine and heroin are classi-fied as narcotics, they are two different drugs with entirely different properties. That the legislature recog-nized this difference is reflected in the fact that in order to prove the crime of possession of narcotics with the intent to sell under § 21a-278 (a), the state must estab-lish that the defendant possessed at least *one ounce* of heroin, whereas the state may obtain a conviction under the same statutory subsection by proving that the defendant possessed as little as *one-half gram* of crack cocaine. Moreover, it is unreasonable to conclude that the legislature would have authorized separate prosecu-tions for the possession of one-half gram of cocaine with the intent to sell and for the possession of one ounce of heroin with the intent to sell, as it apparently has under § 21a-278 (a), and to prohibit separate prose-cutions for the possession of at least one-half gram of crack cocaine with the intent to sell under § 21a-278 (a) and for the possession of heroin with the intent to sell under § 21a-277 (a).

Furthermore, the statutory construction urged by the defendant would lead to a bizarre result. Under the defendant's construction, the state may prosecute him either for possession of at least one-half gram of crack

cocaine with the intent to sell under § 21a-278 (a) or for possession of heroin with intent to sell under § 21a-277 (a), but not for both. The state, however, cannot use the heroin seized from the 33 Irion Street apartment to establish the crack cocaine offense, because heroin and crack cocaine are not fungible for purposes of § 21a-278 (a). Likewise, the state cannot use the crack cocaine seized from the apartment to prove the violation it alleged under § 21a-277 (a) because the information charged the defendant with a heroin offense under that statutory subsection, not with a crack cocaine offense. If the defendant's double jeopardy analysis were correct, therefore, the defendant would be immunized from criminal liability for one or the other of the two crimes merely because he happened to be in simultaneous possession of the two different types of narcotics. We are unwilling to conclude that the legislature could have intended such consequences. See, e.g., *State* v. *Spears*, 234 Conn. 78, 92, 662 A.2d 80 (1995) (we presume legislature does not intend to promulgate statutes or rules that lead to absurd consequences or bizarre results).

Finally, our drug laws reflect the strong public policy that neither the use nor the sale of illicit drugs will be tolerated in this state. The harshest sentences, of course, are reserved for professional drug dealers, who are deemed to pose the greatest threat to our society. Because an obvious purpose of our drug statutes is to reduce the drug trade in Connecticut, multiple punishments for the sale of two different kinds of drugs is entirely consistent with our state drug policy.

We conclude, therefore, that the legislature did not intend to bar multiple punishment for the simultaneous possession of crack cocaine and heroin with the intent to sell.[27] Accordingly, the defendant's double jeopardy claim is without merit.

---

[27] We reached a different conclusion in *State* v. *Rawls*, supra, 198 Conn. 111, wherein we held that the simultaneous possession of cocaine and heroin

## III

The defendant also claims that the state failed to prove beyond a reasonable doubt that he intended to sell the crack cocaine and heroin that was seized from the 33 Irion Street apartment.[28] Although this claim was not raised below, the defendant seeks to prevail under *State* v. *Golding,* supra, 213 Conn. 239–40. Although we agree that review of the claim is appropriate, we are not persuaded by the merits of the defendant's argument.

The following additional facts are necessary to a resolution of this issue. The state elicited the expert testimony of Waterbury police sergeant Edward Stephens to establish that the defendant intended to sell the narcotics found at the 33 Irion Street apartment. Stephens, a thirteen year veteran of the police department, testified that he had been assigned to the department's vice and intelligence division for five years, that he had received extensive training in drug investigations, that he had personally conducted numerous narcotics investigations, including surveillances and undercover operations, that he had made over 500 arrests for drug sales, and that he had interviewed many informants and arrestees as a member of the department's "organized narcotics network unit," a special unit established to develop intelligence information about the drug trade in Waterbury. Stephens opined, on the basis of his training and experience, that the narcotics seized from the apartment had been prepared and packaged for sale rather than for personal use because a drug user, in contrast

did not give rise to two separate possessory offenses under General Statutes § 19-481 (a), now codified as General Statutes § 21a-279 (a). In *Rawls*, we concluded that multiple convictions were barred under § 21a-279 (a) because "[n]either the language of [§ 21a-279 (a)] nor its legislative history indicates an intention to authorize multiple punishment for the simultaneous possession of more than one narcotic." *State* v. *Rawls*, supra, 121. We have no occasion to reconsider our determination in *Rawls* in this case.

[28] The defendant does not challenge the sufficiency of the state's proof that he possessed the narcotics.

to a drug dealer, would not maintain possession of such a large quantity of narcotics. Stephens further explained that it is commonplace for dealers to store their drugs in plastic zip-lock bags, to retain a supply of extra bags, to sell more than one type of illegal drug, and to carry those drugs in a single container, thereby facilitating the disposal of the contraband, if necessary. Stephens also testified that consumers of heroin and crack cocaine generally are arrested in possession of narcotics paraphernalia used to aid in the ingestion of the drugs,[29] and that the absence of any such paraphernalia in the defendant's possession supported the conclusion that he was not a user. Finally, in addition to Stephens' expert testimony, the defendant himself testified that although he had used narcotics at one time, he was not involved with drugs at or around the time of his arrest in September, 1992.

In reviewing the defendant's claim of evidentiary insufficiency, "we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994). Because intent to sell is an element of the crimes with which the defendant was charged, that intent must be proven beyond a reasonable doubt. Id., 126–27. However, " 'direct evidence of the accused's state of mind is rarely available.' " *State* v. *Greenfield*, 228 Conn. 62, 77, 634 A.2d 879 (1993). "Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial

---

[29] Stephens testified that consumers of crack cocaine generally use pipes to smoke the drug, while heroin users frequently use needles to inject the narcotic.

evidence and the rational inferences drawn therefrom. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable." (Citations omitted; internal quotation marks omitted.) *State* v. *Sivri*, supra, 126.

Construed in the light most favorable to sustaining the verdict, the evidence adduced at trial was sufficient to establish beyond a reasonable doubt that the defendant had intended to sell the narcotics seized from the 33 Irion Street apartment. In view of the uncontradicted testimony of Stephens, the jury reasonably could have concluded that only a drug trafficker would have possessed the quantity, type and combination of narcotics found at that address. Moreover, the jury was free to accept the defendant's own testimony that he was not using drugs when he was arrested in September, 1992.[30] Accordingly, the defendant cannot prevail on his claim of evidentiary insufficiency.

The judgment is affirmed.

In this opinion PETERS, C. J., and CALLAHAN, J., concurred.

NORCOTT, J., with whom BERDON, J., joins, dissenting. I agree with the conclusions of the majority regarding the defendant's double jeopardy and sufficiency of the evidence claims. See parts II and III of the majority opinion. I also agree that the record does not support the defendant's claim that he was seized outside of 33 Irion Street in Waterbury. See part I A of

---

[30] The jury was also free to *reject* the defendant's testimony that he never possessed the narcotics seized from the 33 Irion Street apartment. See, e.g., *State* v. *Medina*, 228 Conn. 281, 310, 636 A.2d 351 (1994) (trier of fact may reject or accept, in whole or in part, testimony of witness).

the majority opinion. Regrettably, however, I cannot agree with the majority's treatment of the defendant's claim that the narcotics admitted into evidence against him at trial should have been suppressed because the search that produced them, conducted in a private dwelling, was not supported by probable cause or an exception to the warrant requirement, and was, therefore, violative of the fourth amendment to the United States constitution and article first, § 7, of the state constitution. The majority does not reach the defendant's challenge to the search under the state constitution because it concludes that the defendant has not demonstrated that he has standing to raise it. In essence, my disagreement with the majority rests on its decision not to review the defendant's contention that our state constitution affords him so-called "automatic standing" to raise this claim.

In order to challenge the legality of the search of the apartment at 33 Irion Street under the fourth amendment, and thereby to seek suppression of the fruits of the search under the federal exclusionary rule, the defendant must demonstrate that he had a reasonable expectation of privacy in the place searched. *Rakas* v. *Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). This standard requires the defendant to demonstrate: (1) that he manifested a subjective expectation of privacy with respect to the invaded premises; and (2) that his expectation is one that society would consider reasonable. *State* v. *Joyce*, 229 Conn. 10, 20, 639 A.2d 1007 (1994). I agree with the majority that, on the record before us, the defendant has failed to demonstrate an expectation of privacy respecting the apartment that satisfies this standard as it has been applied and, therefore, cannot prevail on his federal constitutional claim. See *Minnesota* v. *Olson*, 495 U.S. 91, 95–96, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990).

I depart from the majority, however, in its resolution of the defendant's challenge to the search of the apartment under the state constitution. The majority concludes that it cannot reach this claim because the defendant has failed to demonstrate his standing to raise it. In this regard, the majority acknowledges that the defendant has, in its view belatedly, indicated that he relies on the principle of "automatic standing" to challenge the search under the state constitution. Under the rule of automatic standing, a defendant may seek to suppress evidence as the fruit of an illegal search if he or she was legitimately on the invaded premises or has been charged with an offense of which possession of the seized item is an element. See *Jones* v. *United States*, 363 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960).[1] As the majority notes, we have followed the reasonable expectation of privacy standard under the state constitution; *State* v. *Joyce*, supra, 229 Conn. 20; but we have not yet addressed the question whether the doctrine of automatic standing is incorporated by article first, § 7. The majority declines to review this issue, however, because, in its view, "[a]t no point in his main brief did the defendant clearly indicate that we should adopt a rule of automatic standing for purposes of the state constitution," and, apparently alternatively, because the defendant failed to "engage in *any* of the substantive analysis that is a necessary prerequisite to our consideration of state constitutional claims." (Emphasis added.) I believe that the majority's resolution of the defendant's automatic standing claim sells short both his efforts to raise and brief this issue.

---

[1] The automatic standing doctrine was adopted for purposes of the federal exclusionary rule in *Jones* v. *United States*, supra, 363 U.S. 257, but subsequently abandoned in favor of the more restrictive "reasonable expectation of privacy" test. See *United States* v. *Salvucci*, 448 U.S. 83, 92–93, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980); *Rakas* v. *Illinois*, supra, 439 U.S. 143. Under the automatic standing standard, houseguests and casual visitors arguably would have the right to claim the protection of the exclusionary rule under the state constitution.

First, I do not agree that the first time the defendant fairly may be considered to have apprised this court of his reliance on the principle of automatic standing, in connection with his challenge to the search of the apartment under the state constitution, was, as the majority suggests, in his reply brief. I note initially that in his motion to suppress, the defendant apprised the trial court, albeit broadly, that he was invoking article first, § 7, of the state constitution. More importantly, in his main brief, the defendant unmistakably claims that, even if the record does not support the conclusion that he has demonstrated a privacy interest that satisfies the reasonable expectation of privacy test articulated in *Rakas* v. *Illinois*, supra, 439 U.S. 143, and *State* v. *Joyce*, supra, 229 Conn. 20, this court should construe article first, § 7, of the state constitution to incorporate a more inclusive standing doctrine, namely, the automatic standing rule articulated in *Jones*, pursuant to which a casual visitor to a home, such as the defendant here, would have standing to challenge the search of those premises. He expressly states in his brief that he seeks a modification of the current standing rule under the state constitution.[2] Moreover, with regard to the scope of the broader standard he advances, the defendant suggests that the court should permit "personal guests and similar home visitors" to claim the protection of the exclusionary rule under the state constitution. He notes that this court has previously recognized the automatic standing rule in applying the federal constitution,

[2] Specifically, the defendant argues that the federal standard provides only a minimum national standard that " 'does not inhibit state governments from affording higher levels of protection for such rights' "; *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992); *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 57, 469 A.2d 1201 (1984); that an "independent analysis under the Connecticut constitution" affords him standing in the circumstances of this case; and that "although . . . at trial [he] did not argue a *different standard under the state constitution*," review of his claim on appeal for a different standard under the state constitution is appropriate under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). (Emphasis added.)

and he argues that, although this court in *Joyce* articulated the reasonable expectation of privacy test of standing, "[w]hether this court is prepared to bestow standing on houseguests of varying degrees and relations, as the defendant urges, remains an open question in this jurisdiction," referring us to several cases from "other state courts of last resort that hold that state constitutional or statutory provisions require continued adherence to the standing doctrines of *Jones*." In my view, reading the defendant's main brief in a liberal, nontechnical fashion, which, I believe, is appropriate in order not to penalize parties, particularly criminal defendants, for a somewhat inartful or imprecise presentation of issues; cf. *State* v. *Zarick*, 227 Conn. 207, 221, 630 A.2d 565, cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993); *State* v. *Whitaker*, 215 Conn. 739, 751 n.14, 578 A.2d 1031 (1990); we must conclude that the defendant adequately apprised this court, and the state, of his claim that article first, § 7, of the state constitution should be construed to incorporate the broader "automatic standing" rule, at least to the extent that it protects casual visitors.

That the state chose not to address this claim in its brief does not alter my assessment that it was adequately raised by the defendant. The state expressly declined to do so on the ground that the defendant had "fail[ed] to engage in any substantive analysis of article first, § 7," which indicates that the state was aware that the defendant advocated adoption of the broader automatic standing standard pursuant to the state constitution. Furthermore, at oral argument, the state specifically addressed what it termed "the defendant's automatic standing claim." Significantly, the state did not argue that the defendant had not adequately raised this claim, but, rather, argued that the defendant had not provided a compelling justification to adopt it and

that the court should continue to adhere to the reasonable expectation standard under the state constitution.

I also disagree with the majority that the defendant's analysis of his state constitutional claim was not minimally adequate to warrant review. As a prefatory matter, I agree that this court is not obligated to review state constitutional claims that are presented to it without any analysis of the relevant state constitutional provision and the relevant authorities. Indeed, we routinely decline to consider such claims as inadequately briefed. See *State* v. *Perez*, 218 Conn. 714, 723, 591 A.2d 119 (1991) (state constitutional claim inadequately briefed because defendant failed to provide any independent analysis of Connecticut constitutional language, history, tradition and policy); *State* v. *Mooney*, 218 Conn. 85, 89 n.5, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991) (state constitutional claim inadequately briefed because defendant provided no separate analysis of state constitution); see also *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 181 n.4, 629 A.2d 1116 (1993) (state constitutional claim inadequately briefed where argument comprised of one sentence in brief, relied on one case and was devoid of analysis). The defendant's state constitutional claim in this case, however, does not fall within that category.

A careful review of the defendant's briefs reveals that his analysis of his state constitutional claim was more than cursory. In his main brief, the defendant identifies the state constitutional provision on which he relies and identifies and discusses the relevant state and federal precedent on the issue of standing to challenge the legality of searches and seizures by police. His discussion includes the evolution of federal law on the standing issue, and the history of this state's approach to the exclusion of illegally obtained evidence generally and to the standing question specifically. Furthermore, the

defendant provides citation to and urges us to consider the reasoning of several state courts that have continued to adhere to the automatic standing doctrine under state law.[3] Additionally, the defendant argues that extending the reaches of the state exclusionary rule to persons in his circumstances is warranted in order effectively to remedy and deter illegal police behavior, which might otherwise go unreviewed.

In light of these points in the defendant's briefs, I cannot agree with the majority and the state that the defendant failed to offer "any of the substantive analysis" required for our review of state constitutional claims. Although we have articulated several "tools of analysis" that are to be considered "to the extent applicable" in construing the state constitution; *State* v. *Geisler*, 222 Conn. 672, 685–86, 610 A.2d 1225 (1992);[4]

---

[3] See, e.g., *Commonwealth* v. *Podgurski*, 386 Mass. 385, 389, 391 n.11, 436 N.E.2d 150 (1982), cert. denied, 459 U.S. 1222, 103 S. Ct. 1167, 75 L. Ed. 2d 464 (1983); *State* v. *Settle*, 122 N.H. 214, 218, 447 A.2d 1284 (1982); *State* v. *Alston*, 88 N.J. 211, 225–27, 440 A.2d 1311 (1981); *State* v. *Scott*, 59 Or. App. 220, 223–24, 650 P.2d 985 (1982). In his reply brief, the defendant includes additional authority in support of his claim, referring the court to "*Commonwealth* v. *Amendola*, 406 Mass. 592, 595–601, 550 N.E.2d 121 (1990) (principal concerns expressed in *Jones* remain valid despite shift in [United States] Supreme Court thinking); *State* v. *Wood*, [148 Vt. 479, 489, 536 A.2d 902 (1987)] (state constitution premises right upon an objectively defined relationship between person and item seized or place searched, as opposed to subjective evaluation of the legitimacy of the person's expectation of privacy in an area); *State* v. *Owen*, 453 So. 2d 1202, [1204–205 (La. 1984)] (specific language in state constitution confers standing on 'any person adversely affected' by a search); *Commonwealth* v. *Sell*, [504 Pa. 46, 66, 470 A.2d 457 (1983)]; (automatic standing is a 'salutary' rule which protects the rights of defendants and eliminates wasteful preliminary showings of standing in pretrial hearings) . . . ."

[4] In *Geisler*, we articulated the following "tools of analysis" to be used in construing the state constitution: "(1) the 'textual' approach—consideration of the specific words in the constitution; (2) holdings and dicta of this court and the Appellate Court; (3) federal precedent; (4) the 'sibling' approach—examination of other states' decisions; (5) the 'historical' approach—including consideration of the historical constitutional setting and the debates of the framers; and (6) economic and sociological, or

I have never understood these criteria to be anything other than guidelines for the benefit of counsel, who can use them adequately to alert us to a serious state constitutional claim and provide us with a framework within which to evaluate it. These areas of analysis normally provide informative and even compelling sources of authority, and the comprehensive, organized exploration of them by the parties is of substantial benefit to the court and is to be encouraged. I do not believe, however, that by identifying these criteria, we established a rigid formula, the components of which must be formally and specifically invoked in order for a claim to be reviewed, despite the functional sufficiency of the analysis presented. To apply them as such would elevate form over substance, and in no case decided since *Geisler* have we indicated that they are to be applied as technical briefing requirements. In fact, this court has never directly and specifically delineated what constitutes a minimally adequate analysis of this type of claim.

The defendant in this case has briefed several of the areas of analysis normally considered important in state constitutional claims. In light of his efforts, and the lack of specific standards in this area, I believe that the majority's conclusion that the defendant's presentation of the automatic standing issue does not minimally suffice for review is much too restrictive. In my view, the defendant's automatic standing claim has been sufficiently briefed for us to reach that issue. In the same vein, however, and in accordance with the principle that the proper foundation for judicial resolution of claims is full advocacy of both sides of the relevant issues, I would review the defendant's claim only after permitting the state to submit a supplemental brief on this issue.

public policy, considerations." *State* v. *Linares*, 232 Conn. 345, 379, 655 A.2d 737 (1995).

Finally, although it cannot obviate the need for adequate notice and analysis of any state constitutional claim, I wish to underscore the importance of the automatic standing issue, particularly in light of the underlying facts of this case. A standing requirement in this context operates to regulate who may invoke the state exclusionary rule and, therefore, to restrict or expand the extent to which allegedly illegal search and seizure conduct of the police escapes judicial review. There are, of course, costs and benefits to be evaluated in connection with any standing rule, and I withhold judgment until we have the benefit of full briefing of this issue by the state. I note, however, that I am particularly troubled by the context of the search sought to be challenged in this case. It is undisputed that the police, on the barest suspicion, the most significant component of which appears to have been the "character" of this inner city neighborhood, entered a private dwelling, seized at least one of its occupants, and searched for and seized items within it. I am concerned that the people in less than affluent, urban neighborhoods of this state, where a higher population density provides for different patterns of comings and goings than in their suburban counterparts, are being and will continue to be subjected, on the basis of equivocal evidence, not only to invasive, unreasonable police conduct, but also to the lack of a meaningful, effective opportunity to remedy and deter that conduct. The possibility that these citizens are not equally enjoying the constitutional protection against unreasonable searches and seizures, or the ability to challenge allegedly illegal police conduct, makes delay in resolving the issues presented in this case unacceptable.

In my view, the defendant's efforts to raise and brief the automatic standing issue under the state constitution were sufficient to put that issue before us. I would

permit the state another opportunity to brief this issue so that we may conclusively resolve it.

Accordingly, I respectfully dissent.