[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED JUNE 14, 1996 CT Page 4811
Luis Martinez has filed a motion to suppress dated February 22, 1996, and a supplemental motion to suppress evidence dated April 18, 1996.[1] By the first pleading he seeks to suppress a H R .22 caliber 930 revolver with its serial number ground off; a black wallet containing the personal papers of the defendant and Ella Saunders; and a brown, bloodstained sweatshirt with the word, "Browns" in orange lettering. With the supplemental motion, he endeavors to suppress a series of photographs which a Waterbury police officer took of the interior of the first floor apartment at 54 Crown Street, Waterbury, the subject of the search warrant dated September 15, 1994.
On April 26, 1996, this court conducted an evidentiary hearing on the motions and then reviewed the proposed written findings of the parties filed pertinent to the two motions. Martinez is charged in the three-count information with murder, criminal attempt to commit robbery in the first degree and felony murder. These three charges arise out of the gunshot-homicide of Paul DeFillippi at approximately midnight on September 12, 1994.
Although the state has not contested Luis Martinez's standing to bring these motions, we find from the testimony of Ella Saunders, Martinez's girlfriend during September of 1994, that she resided in the Crown Street apartment with her cousin, Darlene Saunders, Darlene's two children and Mr. Demarise Williams. Martinez during this time was a frequent overnight guest of Ella Saunders and had her permission to stay at the apartment when no one else was home. He also had authority to exclude other persons from entering the apartment. Martinez, however, did have another Waterbury residence.
From these facts, we conclude that Martinez has established that in September of 1994, at the time of the search and seizures in question here, he was often a guest in Ella Saunders' apartment; that he had a reasonable expectation of privacy in those premises; and, therefore, has standing to bring these two suppression motions. State v. Hill, 237 Conn. 81, 92 (1996);State v. Carter, 22 Conn. App. 118, 121-23(1990).
Upon our review of the proceedings before the magistrate who issued the search warrant, this court does not conduct a de novo proceeding but rather, must determine whether the affidavit for CT Page 4812 the search warrant furnished probable cause for the issuing magistrate to believe that criminal activity had occurred and that there was a fair probability that evidence or instrumentalities of the crime would be found in a particular place, here, of course, the apartment at 54 Crown Street.
In conducting this judicial review of the magistrate's decision to issue the search warrant, this court must view the facts presented to the magistrate in the light most favorable to a finding of probable cause and further must resolve doubtful or marginal cases by according preference to the issued warrant.State v. Barton, 219 Conn. 529, 536, 540, 552 (1992); State v.Duntz, 223 Conn. 207, 216, 219 (1992); United States v.Travisano, 724 F.2d 341, 345-46 (1983) (the finding of probable cause by the magistrate is a substantial factor tending to uphold the warrant's validity.). Our task is to, "Give deference . . . to all reasonable inferences drawn by the issuing judge and then [we must] decide whether based upon the facts explicitly stated in the affidavit supplemented by those reasonable inferences, the affidavit establishes probable cause." State v. Diaz, 226 Conn. 514,524-27 (1993). Here, the magistrate issued this warrant to search 54 Crown Street for "a .22 caliber handgun, ammunition, bloody clothes and photos of the inside of said address." See the search and seizure warrant.[2]
In their September 15, 1994 affidavit for the search warrant, Waterbury police officers revealed to the magistrate that the homicide victim, Paul DeFillippi, was shot twice at close range with a .22 caliber handgun and that the police had after the autopsy two .22 caliber bullets removed from the victim's body. This affidavit also indicated that Demarise Williams told the police in his own statement under oath that shortly before the homicide, Martinez came to the apartment at 54 Crown Street with a gun and that the defendant expressed the plan to rob the victim, who was at the time sitting on a wall at Beacon and Crown Streets, a short distance from the apartment.
The police further reported to the magistrate in their affidavit that Williams had also told them under oath that he walked with Martinez to the vicinity of the wall and saw the defendant brandish his gun; tell the victim to take everything out of his pockets; and when the victim, DeFillippi, failed to heed the defendant's directions, Martinez "standing right in front of the male" shot DeFillippi twice. CT Page 4813
Immediately thereafter, Williams ran back to the Crown Street apartment, according to the police officers' affidavit, and there met Darlene Saunders. This document further notes that Martinez returned to this apartment, talked about the shooting and thereafter, remained at the 54 Crown Street apartment.
The affidavit also summarizes the affidavit-statement of Darlene Saunders to the police. She related the presence of Martinez in the apartment prior to and after the shooting. Saunders also indicated that Martinez, after the shooting and while in the apartment, threatened her with her not getting out of the Crown Street apartment alive if she informed the police about the events of the crime.
Finally, the affidavit presented by the police officers revealed that Martinez stayed at the apartment, and the next day, September 13, 1994, Darlene Saunders learned that the victim of the shooting had died and so informed Martinez who "left the apartment in the early afternoon." See: Affidavit in Appendix A.
Concerning the warrant authorizing search of the Crown Street apartment for the .22 caliber gun, the ammunition, and the bloody clothes, the magistrate issuing this search warrant obviously concluded from the submitted affidavit and the reasonable inferences drawn therefrom that there was a fair probability that since Martinez was at the apartment before the shooting and stayed there with the gun after the homicide and then proceeded to threaten Saunders if she informed the police about the crime, the defendant's gun and bloody clothing as a result of the point-blank nature of the shooting were located in the apartment.
Given the legal principles which govern our judicial review, especially concerning doubtful and marginal cases, we think that the affidavit by the police officers plus the reasonable inferences necessarily drawn by the magistrate furnished a substantial factual basis for the magistrate's conclusion that probable cause existed to search for the gun, ammunition and bloody clothing.
Accordingly, we, upon review, defer to the magistrate's decision to issue the warrant for these items. Additionally, we observe that while the officers were legally engaged in searching the apartment pursuant to the warrant, when they came upon the .22 caliber gun, since its serial number was "ground off," they had a legal right to seize the gun as an illegal weapon. CT Page 4814 See: section 29-36 of the Connecticut General Statutes. Accordingly, the motion to suppress the gun, ammunition, and bloody clothing is denied.
During the suppression hearing, Detective Michael Gugliotti testified that he located the .22 caliber handgun in a front bedroom of the apartment and then saw a black wallet on a dresser in that same bedroom. He then seized the wallet and after perusing its contents determined that it contained the "personal papers of Luis Martinez and Ella Saunders." See: the Return and Inventory, Appendix A. The detective testified that he seized the wallet to obtain evidence concerning who occupied the room where the gun was found.
Although the police reported the seizure of the black wallet on their return for the warrant, the State argues that the authority for seizing the wallet was not the search and seizure warrant but, rather, the so-called plain view doctrine. While the black wallet was in Detective Gugliotti's plain view, the doctrine does not apply because there was nothing of an incriminating character about the wallet while located on the bureau. Thus, the so-called plain view doctrine is not applicable and it does not furnish a legal basis for the seizure of the wallet and its contents. Thus, the wallet and its contents are ordered suppressed. State v. Hamilton, 214 Conn. 692, 698 (1990).
Finally, we come to the series of photos authorized by the warrant for the inside of the premises to be searched. The defendant moves to suppress the photos because the officers after executing the warrant failed, pursuant to the requirements of section 54-33c, of our statutes to report the existence of the photos on their return.
Although the police requested the issuing magistrate for judicial authority by warrant to take photos and then acted pursuant to the warrant in taking photos, the government now argues that the photos weren't seizures and the officers did not have to make a return. This argument ignores the magistrate's order issued in connection with the warrant to make a return and it also ignores that the fourth amendment protects intangibles such as views of places and conversations. United States v.Villegas, 889 F.2d 1324, 1334 (2 Cir. 1990).
To this time, no amended return has been made by the police for the photos. Since the government continues to fail to file a CT Page 4815 supplemental inventory in violation of the magistrate's order and section § 4-33c of our statutes, this court will invoke its supervisory authority over the management of its own warrants and order the photos suppressed. Because such compliance involves a procedural matter, the order for suppression of the photographs is entered without prejudice to the government complying with the magistrate's order and section 54-33c.
Orders may enter accordingly.
MURRAY, J.