## STATE OF CONNECTICUT *v.* JEFFREY L. DONAHUE (SC 16143)

McDonald, C. J., and Berdon, Norcott, Katz, Palmer, Peters and Callahan, Js.

Argued September 21—officially released December 21, 1999

*Kevin C. Connors*, for the appellant (defendant).

*Robert M. Spector*, deputy assistant state's attorney, with whom, on the brief, were *Mark S. Solak*, state's attorney, and *Roger Caridad*, assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The dispositive issue in this appeal is whether the Appellate Court, in affirming the judgment of the trial court, properly concluded that the police had a reasonable and articulable suspicion to justify stopping the defendant's vehicle and detaining him. We conclude that the Appellate Court improperly affirmed the trial court's determination concerning the existence of the requisite reasonable and articulable suspicion. Accordingly, we reverse the judgment of the Appellate Court.

The defendant, Jeffrey L. Donahue, pleaded nolo contendere to a charge of operating a motor vehicle while under the influence of intoxicating liquor or drugs in

violation of General Statutes § 14-227a.[1] The trial court had denied in part and granted in part the defendant's motion to suppress evidence of his statements to the police and the results of the field sobriety tests the police had conducted prior to his arrest.[2] In its denial of the defendant's motion, the trial court, *Schuman, J.,* held that the defendant had been stopped by the arresting officer pursuant to a reasonable suspicion justifying the stop and that, therefore, the resulting statements and field tests were admissible. Following the defendant's conditional plea of nolo contendere pursuant to General Statutes § 54-94a,[3] the trial court rendered a judgment of conviction and sentenced the defendant to a term of six months imprisonment, execution suspended, and six months conditional discharge. The trial court also suspended the defendant's license, imposed a fine and ordered community service and counseling. The execution of the sentence was stayed to allow the defendant the opportunity to appeal.

On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court improperly had

---

[1] General Statutes § 14-227a (a) provides in relevant part: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense . . . if he operates a motor vehicle . . . (1) while under the influence of intoxicating liquor or any drug or both or (2) while the ratio of alcohol in the blood of such person is ten-hundredths of one percent or more of alcohol, by weight."

[2] The defendant's motion to suppress also sought suppression of the results of any chemical tests administered following his arrest. At the hearing on this motion on May 14, 1998, the state and the defendant stipulated that the officer who had conducted the chemical test had not been properly certified to conduct such test at that time. The trial court granted the defendant's motion as it pertained to the results of the chemical test.

[3] General Statutes § 54-94a provides in relevant part: "When a defendant . . . enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . ."

denied his motion to suppress. The Appellate Court affirmed the judgment of the trial court. *State* v. *Donahue*, 53 Conn. App. 497, 502, 729 A.2d 255 (1999). This certified appeal followed.[4]

On appeal, the defendant claims that the Appellate Court improperly affirmed the trial court's denial of his motion to suppress. He claims that the police did not have a reasonable and articulable suspicion to justify his detention. The state claims that the police did have a reasonable and articulable suspicion, and that the trial court properly denied the motion to suppress.

The Appellate Court determined that the following facts were undisputed. "On December 10, 1997, Sergeant Todd Lynch of the Connecticut state police was on routine patrol on Club Road in Windham. As a shift supervisor, Lynch normally would not be on street patrol. This area, however, had experienced a dramatic increase in criminal activity in the previous four to six weeks, which he was attempting to counteract with his help on patrol. Specifically, Lynch was patrolling a cemetery next to a public housing project located on Club Road where drug dealing and prostitution often took place. Individuals would often park their vehicles at the commercial establishments along Club Road and then walk through the cemetery into the housing project to engage in these illegal activities.

"As Lynch was leaving the cemetery at approximately 1:50 a.m., he noticed a vehicle operated by the defendant turn abruptly from Club Road into the vacant parking lot of the French Club, a private social club that had closed for the evening. The defendant had a passenger with him in the car. As the defendant parked his vehicle

---

[1] The specific question certified in this appeal is: "Did the Appellate Court properly conclude that the police had a reasonable and articulable suspicion to justify stopping the defendant's vehicle?" *State* v. *Donahue*, 249 Conn. 931, 733 A.2d 850 (1999).

and kept the engine running . . . Lynch drove his vehicle across the street toward the defendant's vehicle. By the time Lynch actually entered the French Club parking lot, the defendant had positioned his vehicle so that it was facing the exit of the parking lot. Lynch then made a U-turn in the parking lot so that he could approach the defendant's vehicle from behind and activated his red, yellow and blue flashers, but not his light bar. Before exiting his vehicle, Lynch radioed the defendant's license plate number to the Colchester barracks to find out whether the defendant's vehicle was stolen and if there were any outstanding warrants for its registered owner. Lynch learned that the vehicle was neither reported stolen, nor were there any outstanding warrants.

"Upon receiving this information, Lynch exited his vehicle and approached the defendant's vehicle to ask the defendant for his license and registration. The defendant rolled down his window when he saw Lynch at his driver's side window. At that point, Lynch detected alcohol on the defendant's breath and, after the defendant failed a field sobriety test, Lynch arrested him for operating a motor vehicle while under the influence of intoxicating liquor in violation of § 14-227a." Id., 498–99.

At trial, the defendant moved to suppress evidence obtained after his initial detention on the ground that such detention had been unlawful. The defendant claimed that Lynch lacked a reasonable and articulable suspicion to stop his vehicle and that the ensuing detention, therefore, violated his rights pursuant to the fourth and fourteenth amendments to the United States constitution,[5] and article first, § 7, of the Connecticut constitu-

---

[5] The fourth amendment to the United States constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

The fourth amendment's exclusionary rule is applicable to the states through the fourteenth amendment to the United States constitution. *Mapp*

tion.[6] The trial court ruled that "there's a reasonable and articulable suspicion that criminal activity was afoot when given the vicinity, the time of night the defendant pulls into the dirt parking lot of a club that is closed. And there's no other businesses in the area that could have been opened at that time. So I find that there was [a] reasonable suspicion to justify the stop at that time." Accordingly, the trial court denied the defendant's motion in part.[7]

The Appellate Court affirmed the trial court's decision, concluding that "[t]he defendant's actions . . . were particularly consistent with the type of suspicious activity that often preceded . . . crime in this area. Under these circumstances, Lynch had an objective basis to suspect that the defendant may have been involved in the crimes . . . . The facts of this case support the determination that a reasonable and articulable suspicion existed to justify the stop of the defendant's vehicle." Id., 501.

Before this court, the defendant claims that the Appellate Court improperly concluded that the police had a reasonable and articulable suspicion to justify stopping his vehicle. The state argues in response that Lynch's investigatory stop of the defendant was justified based upon the fact that the defendant was driving his lawfully registered vehicle in a commercial area that recently had seen an increase in criminal activities, especially drug dealing, prostitution, larceny and vandalism, and that "individuals would often park their vehicles at establishments along Club Road and walk across the cemetery into the adjacent public housing

---

v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, reh. denied, 368 U.S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72 (1961).

[6] Article first, § 7, of the Connecticut constitution provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ."

[7] See footnote 2 of this opinion.

project to engage in drug dealing and prostitution." We agree with the defendant that the facts of this case do not reveal a reasonable and articulable basis for a police stop.

As a threshold matter, we set forth the standard by which we review the Appellate Court's ruling. "[W]e undertake a two-part analysis. First, we ascertain whether the trial court's underlying factual findings were clearly erroneous. *State* v. *Torres*, 197 Conn. 620, 625, 500 A.2d 1299 (1985); *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221, 435 A.2d 24 (1980) . . . . Second, in light of the facts found by the trial court, we determine whether the Appellate Court was correct in concluding that the police officer [had] a reasonable and articulable suspicion of criminal activity on which to base his initial investigative approach to the defendant's car. The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts. *State* v. *Torres*, supra, [625]; *State* v. *Lasher*, 190 Conn. 259, 267, 460 A.2d 970 (1983)." (Citation omitted; internal quotations marks omitted.) *State* v. *Cofield*, 220 Conn. 38, 44, 595 A.2d 1349 (1991). We conclude that the Appellate Court's conclusion that Lynch had a reasonable and articulable suspicion of criminal activity is legally and logically inconsistent with the facts before us.

I

Although the issue of whether Lynch's detention of the defendant constituted a "seizure" is not a certified issue before this court, the state asserts, as an alternative ground for affirming the decision of the Appellate Court, that Lynch's stop of the defendant was not a seizure. Indeed, the state cites *State* v. *Hill*, 237 Conn. 81, 87, 675 A.2d 866 (1996), for this court's definition of "seizure." "[A] person [is defined] as seized under our state constitution when by means of physical force

or a show of authority, his freedom of movement is restrained. . . . In determining whether a seizure has occurred, so as to invoke the protections of our state constitution . . . a court is to consider whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Internal quotation marks omitted.) Id. The trial court ruled that Lynch's detention of the defendant did constitute a seizure and the Appellate Court did not disturb that finding.[8]

The state's argument is difficult to sustain in light of its counsel's concession, at oral argument before this court, that under the circumstances in the present case, he—or any other reasonable person—would not have felt free to leave after Lynch pulled up behind the defendant's car and activated the vehicle's overhead flashing lights. Accordingly, we do not disturb the trial court's finding that the defendant was seized for the purpose of an investigative detention at the point at which Lynch pulled up behind the defendant's vehicle and activated the police car's red, yellow and blue flashing lights.

II

Having concluded that the defendant was seized by the action of Lynch, we must now decide whether the defendant's detention was legally justified. We conclude that it was not.

"Article first, §§ 7 and 9[9] of our state constitution permit a police officer 'in appropriate circumstances and in an appropriate manner' to detain an individual for

_____

[8] The trial court stated: "I do find that the sergeant and the trooper stopped the defendant['s] vehicle. The sergeant pulled up reasonably close to the vehicle—granted, did not block the vehicle but reasonably close, turned his flashers on, largely for his own protection but to a reasonable person that indicates a police stop."

[9] Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

investigative purposes even though there is no probable cause to make an arrest. *State* v. *Mitchell*, [204 Conn. 187, 195, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987)]; *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990)." *State* v. *Oquendo*, 223 Conn. 635, 654, 613 A.2d 1300 (1992). "In determining whether the detention was justified in a given case, a court must consider if [b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . These standards, which mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio*, [392 U.S. 1, 20–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9 of our state constitution." (Citations omitted; internal quotation marks omitted.) *State* v. *Oquendo*, supra, 654.[10]

---

[10] Because we conclude that Lynch's detention of the defendant was in violation of article first, §§ 7 and 9, of the Connecticut constitution, we need not address the defendant's contention that his rights pursuant to the United States constitution were violated. We do conclude, however, that the detention of the defendant was in violation of the standard set forth in *Terry* v. *Ohio*, supra, 392 U.S. 20–22. Furthermore, the federal cases relied upon by the dissent are distinguishable from the present case in that they all conclude that reasonable suspicion existed in light of distinct, articulable facts specific to the defendant in question. See *United States* v. *Cortez*, 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981) (reasonable suspicion where border patrol, based on cumulation of facts and deductions taken therefrom, stopped specific vehicle at specific place and time); *Adams* v. *Williams*, 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) (reasonable suspicion where information supplied by reliable informant led to stop of defendant); *United States* v. *Dawdy*, 46 F.3d 1427 (8th Cir. 1995) (reasonable suspicion where car parked in commercial lot at 10 p.m. on Sunday night and driver *began to leave* when police entered lot); *United States* v. *Briggman*, 931 F.2d 705 (11th Cir. 1991) (reasonable suspicion where car parked in commercial lot in high crime area at 4 a.m. and *began to leave* when police entered lot); *United States* v. *Landry*, 903 F.2d 334 (5th Cir. 1990) (reasonable suspicion

"In the present case, we must decide whether article first, §§ 7 and 9 of the Connecticut constitution afford greater protection to the citizens of this state than does the federal constitution in the determination of what constitutes a seizure. We conclude that they do." Id., 649–50. "Police have the right to stop for investigation short of arrest where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . . [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Watson*, 165 Conn. 577, 584–85, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974).

Upon our careful review of the record in the present case, we conclude that Lynch's detention of the defendant was based on nothing more than the location of the defendant's vehicle at an early hour of the morning. Obviously, these factors are not criminal in and of themselves, and they do not form the proper bases for rational inferences that warrant Lynch's intrusion. Furthermore, they do not rise to the standard of a reasonable suspicion that we have found in other cases. See *State* v. *Cofield*, supra, 220 Conn. 46–47 ("[v]iewing the totality of the circumstances in this case, we conclude

where truck *with absent driver parked in front of closed business* at approximately 11:30 p.m.); *United States* v. *Delos-Rios*, 642 F.2d 42 (2d Cir.), cert. denied, 451 U.S. 941, 101 S. Ct. 2025, 68 L. Ed. 2d 330 (1981) (reasonable suspicion where Immigration and Naturalization Service inspectors received specific information from reliable informant). The level of specificity and the indicia of reliability inherent to these cases distinguishes them from the general, nonspecific aura of suspicion existent in the present case. Accordingly, we disagree with the dissent's reliance on these federal cases and conclude that the facts of the present case do not rise to the standard of reasonable and articulable suspicion presented in the federal precedents.

that the informant had supplied [the police officer] with information that had sufficient indicia of reliability and corresponded adequately to his observations in the parking lot to provide him with [a] reasonable and articulable suspicion sufficient to justify approaching the defendant's car for further investigation"); *State* v. *Lamme*, supra, 216 Conn. 175 (after hearing police broadcast describing vehicle driven by intoxicated individual, officer was justified in stopping car that matched description driving without its headlights illuminated in violation of General Statutes § 14-96a [d]); *State* v. *Januszewski*, 182 Conn. 142, 149, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981) ("[t]he plainly furtive conduct of the occupants of that vehicle observed by the officer as he approached certainly justified the limited intrusion upon the defendant's personal liberty"); *State* v. *Watson*, supra, 165 Conn. 585–86 (police stop of defendants was justified when their vehicle was observed pulling into parking lot of motel at 11:30 p.m., discharging four occupants and moving next to exit, and four occupants were then observed coming from rear of motel, walking "hurriedly and cautiously" back to car).

The state's argument that Lynch was justified in stopping the defendant due to an increase in crime in the area is unpersuasive. We considered and rejected a similar argument in *State* v. *Oquendo*, supra, 233 Conn. 655. In *Oquendo*, we held that the officer's detention of the defendant was not justified when the officer's suspicions were based on the following factors: the clothing worn by the defendant; the increased crime rate in the area in which the defendant was walking; the fact that the officer knew the defendant's companion was a recent arrestee for larceny and burglary; and the officer's " 'hunch' " that the defendant was about to commit a crime. Id., 641. We found that those factors were considered insufficient to make the officer's stop

of the defendant "constitutionally reasonable." Id., 657. Commenting specifically on the officer's suspicion of the defendant based upon the fact that others recently had committed burglaries in the area, we noted: "Although burglaries had been reported in the general area . . . [the officer] had not received any report that a burglary had been committed in that area on [that] evening . . . nor did he possess information linking the defendant . . . to a particular burglary in the area." Id., 655. "A history of past criminal activity in a locality does not justify suspension of the constitutional rights of everyone, or anyone, who may subsequently be in that locality." (Internal quotation marks omitted.) Id., 655 n.11.

Here, the state argues that the following five factors produced a reasonable suspicion that the defendant was engaged or about to engage in criminal activity: (1) he was driving in a deserted area late at night; (2) he made an abrupt turn into the parking lot; (3) he pulled into an empty, unlit parking lot of an establishment that had closed for the evening; (4) his vehicle was in an area that had experienced a rise in criminal activity; and (5) his behavior was "consistent with the type of behavior that often preceded the criminal activity Lynch was out on patrol investigating." We disagree and conclude that, as in *Oquendo*, the officer did not have a reasonable and articulable suspicion. We are unpersuaded that the totality of circumstances in this case reach the level of a reasonable suspicion found in our precedents. Here, the defendant had not committed any traffic violation. He had not been driving erratically. Neither he nor his passenger had exhibited any furtive conduct. Indeed, neither the defendant nor his passenger had exited the vehicle. Furthermore, the vehicle had not been the subject of any police investigation; indeed, Lynch even checked with the Colchester barracks and determined that the vehicle was not stolen,

and that neither the vehicle nor its registered owner were wanted by the police.

Thus, we conclude that the police officer had no reasonable and articulable suspicion that the defendant had committed or was about to commit a crime. According to the principles of our state constitution as articulated in *State* v. *Oquendo,* supra, 223 Conn. 654, we conclude that the trial court improperly denied the defendant's motion to suppress.

While there is no evidence or suggestion in the record that Lynch or any other individual involved in law enforcement was engaged in the practice, the present case does raise the insidious specter of "profiling":[11] the criminalizing of locations, neighborhoods or even individuals due to generalized perceptions of supposedly identifying and suspicious characteristics. This court cannot permit such a suspension of constitutional protections.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court, and remand the case to that court with direction to vacate the plea of nolo contendere and to grant the defendant's motion to suppress.

In this opinion BERDON, KATZ and PETERS, Js., concurred.

---

[11] As defined in the racial context, "profiling" has come to refer to the practice of "singl[ing] out black and Hispanic drivers based on ostensible traffic violations and subject[ing] them to criminal searches." *State* v. *Harvey,* 159 N.J. 277, 368, 731 A.2d 1121 (1999) (Handler, J., dissenting); see also D. Harris, " 'Driving While Black' and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops," 87 J. Crim. L. & Criminology 544 (1997); H. Gates, "Thirteen Ways of Looking at a Black Man," New Yorker, October 23, 1995, p. 59 (constant stops by police is what "many African-Americans know as D.W.B.: Driving While Black"). As is obvious in the present case, the defendant is not a member of a racial minority. The concern that is identified in the context of racial profiling is, however, applicable here, as it was in *Oquendo,* in that the constitutional rights of

MCDONALD, C. J., dissenting. I join Justice Callahan's dissent. In addition, I would hold that the police officer's approach of the defendant was not an investigative stop. In *Terry* v. *Ohio*, 392 U.S. 1, 20–27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the United States Supreme Court recognized that police officers, upon reasonable and articulable suspicion, may take "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat . . . [that] as a practical matter could not be, subjected to the warrant procedure." Id., 20. *Terry* concerned a police officer who approached three men on the street and asked their names. The actions of the men had aroused his interest. After the men mumbled their response, the officer physically seized one of them and conducted a "pat down." After he felt a gun in the man's coat, he ordered them into an adjacent store where he searched the man and seized a revolver. Id., 6–7. It was under these circumstances that the United States Supreme Court upheld the constitutionality of a police officer conducting "a stop and frisk" when there is reasonable and articulable suspicion. Id., 30–31.

In this case, the defendant and his passenger were parked with the car's engine running at 1:50 a.m. in a dimly lit and otherwise deserted parking lot adjacent to a public highway. See *State* v. *Donahue*, 53 Conn. App. 497, 498, 729 A.2d 255 (1999). The officer parked his vehicle behind the defendant's car, which faced the exit of the parking lot. Before approaching the defendant's car, the officer put on his flashing lights; id.; in the trial court's words, "largely for his own protection."

The majority's decision expands the *Terry* doctrine to find that a police officer merely approaching and speaking with a defendant seated in a parked vehicle

the defendant are violated as a result of a police stop predicated on no reasonable and articulable suspicion.

is an "investigative stop"; *Terry* v. *Ohio*, supra, 392 U.S. 20–27; or, as this court described, "a brief investigatory detention." State v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990). This holding runs counter to our prior decisions that recognize that a police officer's mere approach is not an investigative stop. In *State* v. *Damon*, 214 Conn. 146, 153–54, 570 A.2d 700 (1990), this court quoted the United States Supreme Court's holding that "[p]olice officers do not violate an individual's constitutional rights by approaching him, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering into evidence in a criminal prosecution his voluntary answers to such questions. *Florida* v. *Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State* v. *Brown*, 199 Conn. 47, 52–53, 505 A.2d 1225 (1986)."

Here, the police cruiser's flashing lights were, in the darkness, the only means to mark the vehicle as a police car and identify the police officer approaching the defendant's vehicle. Police officers wearing a uniform and displaying a badge often approach either on foot, bicycle or in a marked police cruiser to question persons. Detectives in plain clothes, showing a badge or credentials, must interview people to conduct police investigations. Although one may feel obligated to cooperate with an officer in these circumstances, the law should not require, as the majority does today, that the officer have a reasonable and an articulable suspicion of criminal activity before approaching a person. The majority's decision prohibits a police officer from approaching and talking to anyone unless the officer has such suspicion.

The safety and security of law-abiding citizens strongly mitigates against the result of this case. The use of beat patrols on foot or bicycle, which encourage

such encounters, has been recognized as effective in preventing and reducing crime.[1]

Moreover, the government's core function is to protect the public. The United States Supreme Court

[1] A number of studies show that community policing strategies result in overall crime reduction and quality of life improvements. See generally D. Livingston, "Police Discretion and the Quality of Life in Public Places: Courts, Communities, and the New Policing," 97 Colum. L. Rev. 551, 582–83 (1997); G. Kelling, "Police and Communities: the Quiet Revolution," United States Department of Justice, Perspectives on Policing (June, 1988); G. Kelling, "Foot Patrol," United States Department of Justice, Crime File, Study Guide (1988).

In one study, police officers engaged in "citizen contact patrol" in Houston, Texas. Officers patrolled in cars and made direct contact with residents. W. Skogan, Disorder and Decline: Crime and the Spiral of Decay in American Neighborhoods (1990) pp. 100–107. As a result of these efforts, physical and social disorder declined while citizens' satisfaction with the area and police performance improved.

In another study, police officers on bicycle patrol were credited with reducing crime by 23 percent in one neighborhood in Kansas City, Kansas. See E. Cleaver II, "Violent Crime Control and Law Enforcement Act of 1994: The Proactive Approach to Preventing Crime," 20 Dayton L. Rev. 733, 735 (1995).

Another study in Flint, Michigan, looked at the implementation of "community-based foot patrols" that "serve[d] as catalysts in the formation of neighborhood associations . . . ." D. Payne & R. Trojanowicz, "Peformance Profiles of Foot Versus Motor Officers," National Center for Community Policing, School of Criminal Justice, Michigan State University (1985). "The Neighborhood Foot Patrol Program reduced crime rates by 8.7 percent. More dramatic were the reductions in calls for service, which decreased by 42 percent over the period 1979–1982. Citizens began handling minor problems themselves, or the foot officer acted as mediator on an informal basis, negating the need for a formal complaint. . . . [A]dditional evidence indicated that citizens felt safer, were satisfied with the program, felt that it had impacted the crime rates, and that it had improved police-community relations." Id.

Police officials in New York City credited more officers "on the beat" with significant crime reduction. See W. Bratton, "New Strategies for Combating Crime in New York City," 23 Fordham Urb. L.J. 781, 786–78. Between 1994 and 1995, overall crime was reduced by 27 percent and by 40 percent from 1991 to 1995. See id., 788.

In a Newark, New Jersey, study, police officers' foot patrol lowered citizens' fear of crime and self-protective actions and increased their perception of safety. See D. Livingston, supra, 97 Colum. L. Rev. 582–83.

observed in *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L. Ed. 2d 135 (1803), that "[o]ne of the first duties of government is to afford . . . protection." Among the basic duties of any government is to protect the lives and property of its citizens through effective law enforcement. The framers of the United States constitution, in the wake of Shays' Rebellion, perceived "an opportunity to strengthen the national government to deal with internal disorders . . . ." J. Bybee, "Insuring Domestic Tranquility: *Lopez*, Federalization of Crime and the Forgotten Role of the Domestic Violence Clause," 66 Geo. Wash. L. Rev. 1, 22, and generally 19–24 (1997). The framers' broader purpose was reflected in the preamble to the constitution, which provides: "We the People of the United States, in Order to form a more perfect Union . . . *insure domestic Tranquility* . . . do ordain and establish this Constitution for the United States of America." (Emphasis added). In article four, § 4, of the United States constitution, the framers provided that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government . . . ." The majority's decision unreasonably frustrates Connecticut law enforcement's ability to protect its citizens from domestic violence and its obligation to ensure domestic tranquility as insured by the federal constitution.[2]

For these reasons, I would affirm the Appellate Court's decision upholding the trial court's ruling in this case.

Accordingly, I dissent.

---

[2] The police officer's actions in this case protected the public from the dangers posed by a drunk driver. See, e.g., *South Dakota* v. *Neville*, 459 U.S. 553, 558, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983) ("[t]he carnage caused by drunk drivers is well documented"); *State* v. *Swain*, 245 Conn. 442, 456, 718 A.2d 1 (1998) ("[i]n Connecticut, the legislature has promulgated an unambiguous policy aimed at ensuring that our highways are safe from the carnage associated with drunken drivers" [internal quotation marks omitted]).

CALLAHAN, J., with whom MCDONALD, C. J., and PALMER, J., join, dissenting. I disagree with the majority's conclusion that the police lacked a reasonable and articulable suspicion to make an investigatory stop of the car driven by the defendant, Jeffrey L. Donahue.

The Appellate Court summarized the undisputed facts as follows. "At 1:50 a.m. [on the morning of Wednesday, December 10, 1997], [Sergeant Todd] Lynch [of the state police] observed the defendant's vehicle pull abruptly into a dimly lit, deserted parking lot [adjacent to a closed social club] in an area known for a recent increase in illicit drug sales, prostitution, theft, vandalism and assaults. Moreover, Lynch testified that he was patrolling Club Road specifically because his subordinate police officers needed help to respond to this increase in crime. Moreover, individuals would often park their vehicles along Club Road and walk across the cemetery into the public housing project to engage in drug dealing and prostitution." *State* v. *Donahue*, 53 Conn. App. 497, 501, 729 A.2d 255 (1999).

"Under both the federal and state constitutions, police may detain an individual for investigative purposes if there is a reasonable and articulable suspicion that the individual is engaged in or about to engage in criminal activity." *State* v. *Groomes*, 232 Conn. 455, 467–68, 656 A.2d 646 (1995). A determination of reasonable suspicion must be based on the whole of the circumstances "viewed through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training." *United States* v. *Delos-Rios*, 642 F.2d 42, 45 (2d Cir.), cert. denied, 451 U.S. 941, 101 S. Ct. 2025, 68 L. Ed. 2d 330 (1981); see also *State* v. *Anderson*, 24 Conn. App. 438, 441, 589 A.2d 372, cert. denied, 219 Conn. 903, 593 A.2d 130 (1991). To state the proposition another way, we may inquire whether an officer's failure to investigate under the circumstances might have constituted a dereliction of his duty.

See *Commonwealth* v. *Cortez*, 507 Pa. 529, 491 A.2d 111, cert. denied, 474 U.S. 950, 106 S. Ct. 349, 88 L. Ed. 2d 297 (1985); W. Schaefer, The Suspect and Society (1967) pp. 41–42.

Because otherwise innocuous behavior reasonably may arouse suspicion if it occurs at certain times and places; *United States* v. *Dawdy*, 46 F.3d 1427 (8th Cir. 1995) (reasonable suspicion where car parked in commercial lot at 10 p.m. on Sunday night and driver began to leave when police entered lot); *United States* v. *Briggman*, 931 F.2d 705 (11th Cir. 1991) (reasonable suspicion where car parked in commercial lot in high crime area at 4 a.m. and began to leave when police entered lot); *United States* v. *Landry*, 903 F.2d 334 (5th Cir. 1990) (reasonable suspicion where truck parked in front of closed business at approximately 11:30 p.m.); *Tyler* v. *United States*, 302 A.2d 748 (D.C. 1973) (police had right to investigate where defendant sitting in car in alley at 3:30 a.m. with engine and lights off); 4 W. La Fave, Search and Seizure (3d Ed. 1996) § 9.4 (f); our law allows the police to make a minimally intrusive inquiry even before probable cause exists to believe a crime has been or will be committed.

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* [v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)] recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (Citation

omitted.) *Adams* v. *Williams*, 407 U.S. 143, 145–46, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972).[1]

"The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers." *United States* v. *Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

To conclude, as the majority does, that a reasonable and articulable suspicion did not exist in the present case is to conclude that a police officer may neither exercise the common sense of any layman, nor conduct the most rudimentary investigation that is basic to his law enforcement function.[2] Instead, he is reduced "to simply shrug[ging] his shoulders and allow[ing] a crime to occur or a criminal to escape." *Adams* v. *Williams*, supra, 407 U.S. 145. This runs contrary to the spirit and purpose of both state and federal jurisprudence on investigatory stops. I respectfully dissent.

---

[1] The majority decision considered in light of our earlier ruling in *Binette* v. *Sabo*, 244 Conn. 23, 710 A.2d 688 (1998) (creating state analogue to *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 [1971], for damages under article first, §§ 7 and 9, of Connecticut constitution), may give rise to an action for damages whenever the police make a minimally intrusive inquiry of a person who is in an area where at the time he has no apparent right or reason to be. Such a result will discourage legitimate police investigation and detract from the safety of Connecticut's citizens and their property.

[2] The majority's concern about racial profiling is misplaced. This is not a case of racial profiling. The defendant is not a member of a racial minority. Lynch detained the defendant because the circumstances—irrespective of race—gave rise to a reasonable and articulable suspicion. The "insidious specter of 'profiling' " should not blind us to the facts here.