[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 10116
The defendant, JOIE CASIMONO, also known as JOSEPH CASIMONO, was arrested September 19, 1999 in New London, CT and charged with Operating a Motor Vehicle While Under Suspension in violation of C.G.S. § 14-215. A substitute information was filed on October 1, 1999 charging the defendant with Operating Under Alcohol Related Suspension in violation of C.G.S. § 14-215 (c). October 29, 1999, the defendant filed a Motion to Suppress the fruits of the investigation conducted by New London Police Officers, including the statements made by the defendant at the time of the arrest and information relating to the status of the defendant's driver's license. The defendant claims that the New London Police Officers did not have a "specific and articulable factual basis" to conduct an investigatory stop of the defendant.
At the time the motion was filed, State v. Donahue, 251 Conn. 636
(1999) was pending and had been recently argued in the Connecticut Supreme Court. A decision in that case was issued December 21, 1999. An evidentiary hearing was held in this matter on May 3, 2000. The Court heard oral argument on May 4, 2000 and the parties have submitted supplemental briefing. Counsel for the defendant submitted a brief on June 13, 2000 bringing additional authority to the Court's attention. Based on the facts set forth below and for the reasons set forth below, the Motion to Suppress is denied.
 FINDINGS OF FACT
Two witnesses testified at the hearing on May 3: Officers Todd Bergeson and Darwin Garnett of the New London Police Department. The Court credits the testimony of the Officers and finds the following facts.
1. On September 19, 1999, New London Police Officers Todd Bergeson and Darwin Garnett patrolled the neighborhood that encompasses 171 Garfield Avenue in New London. The officers were both working the 6 p.m. to 2 a.m. shift as part of a "Safe Streets" initiative. Together, the officers covered Post 8 and Post 9, a relatively small area in New London known as a high crime area. The officers' objectives were to improve the quality of life for residents in the area with frequent patrols during certain times and to take a proactive approach that would reduce the commission CT Page 10117 of narcotics offenses as well as violent felonies and hopefully prevent crimes from occurring. The officers, who had been patrolling this particular neighborhood for over a year, knew the residents and others who frequented the area. They were also familiar with the automobiles used by the residents of this area.
2. The officers were both familiar with the multi-unit apartment building located at 171 Garfield Avenue. The building is a three-story home that had been converted into 12 apartment units. Both officers participated in a number of narcotics raids at that location. Officer Bergeson had assisted the Statewide Narcotics Task Force in the execution of at least five separate search warrants at 171 Garfield Avenue during the six-month period preceding the events of September 19, 1999.
3. As the officers were conducting their patrol on September 19, they observed a Ford van driving in the vicinity of Jefferson Street and Garfield Avenue at approximately 1:30 a.m. The officers had previously seen the vehicle earlier that day in several known narcotics areas within the City of New London. They recognized it and knew it was not one of the vehicles owned or operated by any of the residents of 171 Garfield.
4. The landlord of 171 Garfield had requested on a number of occasions that the New London Police Department assist with a trespassing problem at the apartment building which had been known as a location from which drug (primarily crack cocaine) trafficking occurred. The landlord had made complaints on several occasions to the New London Police Department concerning the presence of nonresidents at the building late into the night. As a result, the officers regularly patrolled in the area of 171 Garfield, performing property checks, sometimes as often as 4-5 times a night. A "no trespassing" sign was posted on the apartment building. Officer Bergeson had issued between 5 and 10 infractions or summonses to trespassers and had, on occasion, asked trespassers to leave the property without issuing a summons.
5. Narcotics trafficking generally slowed down or ceased when Officer Bergeson and his partner, Officer Garnett, came on duty at 6 p.m. Drug trafficking was often back up and running again by 2:00 a.m. when they went off-duty. When he saw the van pull in to 171 Garfield at 1:30 a.m. on September 19, 1999, Officer Bergeson believed the drug trafficking was "starting up again."
6. The officers observed the van on the evening of September 19, 1999, ran the license plate, and determined that the van was registered to a Pasquale Casimono in Waterford, Connecticut and not to anyone residing at 171 Garfield. CT Page 10118
7. The driveway of 171 Garfield is narrow, with a sharp incline along one side. The van pulled in and stopped on its own in the private driveway. Knowing that the van was from out-of-town, when it turned into the driveway of 171 Garfield, the officers followed. As the marked patrol car pulled behind the van, the van was not in a position to leave, nor was the patrol car able to pull around the vehicle to permit it to leave. The patrol car had its lights on, including a spot light to provide illumination, but the officers did not activate flashers or a siren.
8. As the officers pulled into the driveway, the passenger in the vehicle got out and ran toward the fire escape rear entrance to the third floor of the building. They recognized the passenger as a drug "runner" whom they had observed on earlier occasions, although they did not know his name. They knew he was not a resident of 171 Garfield. The officers knew that the drug dealing conducted out of 171 Garfield was generally conducted out of the third floor by using the fire escape. The fire escape was not the main entrance to the building as most residents generally used the front door.
9. Officer Garnett called out to the passenger who then came over to them. The passenger, Eric Scott, stated that he was there to see his cousin. Since Mr. Scott could not name the cousin he said he was there to visit, nor which unit his cousin resided in, the other officer, Officer Bergeson, then spoke with the driver of the vehicle. The driver stated he was there to visit someone by the name of Monica. Officer Bergeson knew there was no resident of the building named Monica. Officer Bergeson contacted dispatch with the operator's license number and determined that Casimono's license to drive had been suspended in 1991 and that he was, therefore, driving while his license was under suspension. Officer Bergeson issued a misdemeanor summons to Casimono; no arrests were made.
10. A tenant came out of the building and went to his car. The passenger, Mr. Scott, asked the tenant for a ride. The tenant indicated that he did not know Mr. Scott, but gave Mr. Scott a ride.
 DISCUSSION
"[A] person [is defined] as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained." State v. Donahue, 251 Conn. 636, 642-43 (1999) (Internal citations omitted).
Brief investigatory seizures and detentions of motorists are permitted by our state and federal constitutions when the police" . . . have a reasonable and articulable suspicion that the occupants of a vehicle have CT Page 10119 engaged, are engaged or are about to engage in criminal activity.". Statev. Anderson, 24 Conn. App. 438, 441 (1990) (Internal citations omitted);State v. Pierog, 33 Conn. App. 107, 111 (1993).
"Article first, §§ 7 and 9 of our state constitution permit a police officer in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes even though there is no probable cause to make an arrest. In determining whether the detention was justified in a given case, a court must consider if [biased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . A court reviewing the legality of the stop must, therefore, examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom." (Internal citations and internal quotation marks omitted.)State v. Donahue, 251 Conn. at 634-44. "Police have the right to stop for investigation short of arrest where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . . [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together, with rational inferences from those facts, reasonably warrant that intrusion." Id. at 645 (citing Statev. Watson, 165 Conn. 577, 584-85, cert. denied, 416 U.S. 960
(1974) (citations omitted; internal quotation marks omitted).
In Donahue, the Connecticut Supreme Court held that a police officer did not have a reasonable and articulable suspicion to detain a motorist after an officer observed the operator and a companion parked in the lot of a closed social club at approximately 1:50 a.m. The Court held that because the operator had not driven erratically, committed a motor vehicle violation, exhibited furtive conduct, or exited the vehicle, the police lacked reasonable and articulable suspicion that the defendant had committed or was about to commit a crime. Id. at 648.
The facts set forth above present circumstances that differ from those in Donahue in several significant ways. First, the officers had seen the vehicle earlier in the day in known drug trafficking locations and recognized it as it drove along Jefferson Street in the early morning hours of September 19, 1999 before turning onto Garfield Avenue. Second, they had run the license plate and determined that the vehicle was registered out of town. Because they were familiar with the vehicles used by the residents of 171 Garfield, they knew it was not owned or used by any of the residents. Moreover, the police officers were acting based upon a complaint of unwanted trespassing from the owner of the property where the defendant parked his van. Although the incident did occur in a high crime location, the fact that the defendant's van was in a high CT Page 10120 crime location was not the basis for the officers' decision to investigate further.
Additionally, the conduct of the passenger upon approach of the officers warranted further investigation by the officers. As the officers entered the private driveway of 171 Garfield, the passenger exited the vehicle and proceeded quickly toward the rear third floor fire escape, a known location for dealing drugs, particularly at that time in the early morning hours. When asked, the passenger was unable to state who he was there to see. This warranted further investigation, as did the driver's statement that he was there to see "Monica." The officers knew this statement was inconsistent not only with the statement of the passenger, but with their knowledge of the residents of the building. Both officers testified that if they had recognized the individuals as residents or guests of 171 Garfield, they would have taken no further action.
This case is closer to the facts of State v. Januszewski, 182 Conn. 142
(1980), than State v. Donahue. In Januszewski, the Supreme Court wrote that "the plainly furtive conduct of the occupants of that vehicle observed by the officer as he approached certainly justified that limited intrusion upon the defendant's personal liberty." 182 Conn. at 149. Here, the van pulled in on its own into the driveway of a private multifamily residence with a posted "no trespassing" sign which the officers routinely patrolled based on complaints by the landlord. The officers knew the van was not one of the vehicles used by the residents. As they approached, the passenger ran toward the fire escape, a known drug trafficking location. The officers had a duty to protect the residents in the building and the property of the owner who had previously requested such protection.
As set forth in State v. Watson, 165 Conn. 577, 585:
 The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.
Here, the officers' suspicions became confirmed and further aroused as the passenger headed toward the fire escape and then was unable to answer questions about whom he was there to see and in which apartment. The specific and articulable facts as set forth above, taken together with the rational inferences derived from those facts, reasonably warranted the CT Page 10121 intrusion. Terry v. Ohio, 392 U.S. 1 (1968). Here the conduct observed by the officers led them reasonably to conclude in light of their experience that criminal activity may be afoot.
The recently decided case of State v. Lipscomb, 58 Conn. App. 267
(June, 2000) does not require a contrary conclusion. In Lipscomb, the Connecticut Appellate Court found that police officers did not have a reasonable and articulable suspicion sufficient to warrant an investigative stop when they observed the defendant pick up a woman whom they believed to be a prostitute. The Appellate Court found that the inference that the defendant's passenger was a prostitute was tenuous at best and that the woman's conduct in waving her arms and getting into his car did not qualify as an objective manifestation of criminal activity sufficient to warrant an investigative stop. Here the officers were not drawing a tenuous inference; they were acting on the basis of their knowledge and experience which led them reasonably to conclude that criminal activity might be afoot at this private residence.[1]
In view of all the evidence, the Court finds that the officers had a reasonable and articulable suspicion that justified the stop of the defendant's vehicle in the driveway of 171 Garfield Avenue in New London, CT on September 19, 1999.
For the foregoing reasons, the motion to suppress is DENIED.
Jongbloed, J.